UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TEHEA L. MINKE,

                Plaintiff,        Civil Action No. 15-12516
                                     Honorable Stephen J. Murphy, III
                                     Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 15]**

Plaintiff Tehea Minke ("Minke") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [13, 15], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Minke is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [15] be DENIED, Minke's Motion for Summary Judgment [13] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

**II.     REPORT**

   **A.     Procedural History**

On January 20, 2012, Minke filed an application for SSI, alleging disability as of that date.[1]  (Tr. 226, 374-80).  This application was denied initially on March 26, 2012.  (Tr. 323-26).  Minke filed a timely request for an administrative hearing, which was held on July 2, 2013, before ALJ Kevin Detherage.  (Tr. 203-58).  Minke, who was represented by attorney Lewis Seward, testified at the hearing, as did vocational expert David Holwerda.  (*Id.*).  On July 26, 2013, the ALJ issued a written decision finding that Minke is not disabled.  (Tr. 184-97).  On May 18, 2015, the Appeals Council denied review.  (Tr. 45-50).  Minke timely filed for judicial review of the final decision on July 15, 2015.  (Doc. #1).[2]

   **B.     Framework for Disability Determinations**

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or

---

[1] Minke had filed previous applications for DIB and SSI.  On February 26, 2010, ALJ Joel Fina issued a written decision finding that Minke was not disabled under the Act.  (Tr. 300-07).  On May 19, 2010, the Appeals Council denied review, and Minke did not appeal this claim any further.  (Tr. 184).

[2] Apparently, Minke has since been approved for SSI after filing a new claim.  (Doc. #13 at 9).

mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C. Background

#### 1. Minke's Reports and Testimony

At the time of the administrative hearing, Minke, who was born in 1967, was 5'3" tall and weighed 150 pounds. (Tr. 206-07, 393). She lived in an apartment with her 20-year-old son (her 17-year-old autistic son lived with his father). (Tr. 207-08, 420). Minke graduated from high school but had no further education. (Tr. 207, 399). She stopped working in 1999 or 2000, because of "issues with [her] health" and because her son needed care. (Tr. 209, 398).

Minke alleges disability as a result of various medical conditions, including fibromyalgia, brittle diabetes, neuropathy, back pain, and depression. (Tr. 212-13, 245-46, 398). She takes numerous medications, and injects herself with insulin multiple times a day; nonetheless, she still

frequently experiences diabetic ketoacidosis ("DKA"), which occurs when her blood sugar gets so high that it cannot be controlled with insulin, her body starts to "shut down," and she requires an IV insulin drip. (Tr. 212-15, 243, 401). According to Minke, she experiences DKA monthly or every couple of months, and this condition requires immediate hospitalization. (Tr. 243-44). Her diabetes is complicated by a prior gastric bypass surgery, which makes it difficult for her body to absorb food and medications. (Tr. 244-45).

Minke indicated that she is able to get dressed in the morning and, some days, prepare simple meals. (Tr. 224, 227, 422). Her adult son does all of the laundry, as well as most of the cooking and cleaning. (Tr. 422). She cannot stand at the sink to wash dishes, and she no longer drives because her legs "jerk" and "twitch," and she worries she will cause an accident. (Tr. 224-25). She has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing. (Tr. 425). She uses a cane when she leaves her apartment, and uses an electric cart when she goes to the store. (Tr. 426). Minke testified that some days, she is unable to walk at all; indeed, just prior to the administrative hearing, she had been hospitalized twice because she "could not stand up." (Tr. 216-17).

Minke also testified that she was put on probation for taking her son's Adderall; subsequently, she pled guilty to a probation violation when her "pill counts" were off. (Tr. 234-37). While in jail on this probation violation, Minke refused to eat and to take her insulin so that she could die "of natural causes," so she was hospitalized for what was viewed as an apparent suicide attempt. (*Id.*). She continues to have suicidal thoughts and is seeing a counselor on a regular basis. (Tr. 238). She has difficulty with her memory and with maintaining attention and concentration. (Tr. 238-39).

4

*2. Medical Evidence*

The Court has thoroughly reviewed Minke's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

*3. Vocational Expert's Testimony*

David Holwerda testified as an independent vocational expert ("VE") at the administrative hearing. (Tr. 248-55). The ALJ asked the VE to imagine a claimant of Minke's age, education, and work experience, who could perform sedentary work, with the following additional limitations: limited to simple, routine, and repetitive tasks; can work only in a work environment free of fast paced production requirements and involving only simple work-related decisions; work environment can have only routine workplace changes; only occasional stooping, kneeling, crouching, and crawling; no climbing ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; frequent handling and fingering with the bilateral upper extremities; and no exposure to hazardous conditions such as heights and machinery with moving parts. (Tr. 252-53). The VE testified that the hypothetical individual would be capable of performing the jobs of assembler (28,000 jobs nationally), inspector (13,000 jobs), and machine operator tender (44,000 jobs). (Tr. 253-54). Upon questioning by Minke's attorney, however, the VE testified that if the hypothetical individual missed two or more days per month because of medical problems, she would be precluded from all competitive work. (Tr. 255).

**D. The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Minke is not disabled under the Act. At Step One, the ALJ found that Minke has not engaged in substantial gainful activity since January 20, 2012, the application date. (Tr. 186). At Step Two, the ALJ found that

Minke has the severe impairments of diabetes mellitus, fibromyalgia, depression, restless leg syndrome, arthritis, and back pain. (Tr. 187). At Step Three, the ALJ found that Minke's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (*Id.*).

The ALJ then assessed Minke's residual functional capacity ("RFC"), concluding that she is capable of performing sedentary work, with the following additional limitations: limited to simple, routine, and repetitive tasks; can work only in a work environment free of fast paced production requirements and involving only simple work-related decisions; work environment can have only routine workplace changes; only occasional stooping, kneeling, crouching, and crawling; no climbing ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; frequent handling and fingering with the bilateral upper extremities; and no exposure to hazardous conditions such as heights and machinery with moving parts. (Tr. 189).

At Step Four, the ALJ determined that Minke has no past relevant work. (Tr. 195). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Minke is capable of performing a significant number of jobs that exist in the national economy. (Tr. 196). As a result, the ALJ concluded that Minke is not disabled under the Act. (Tr. 197).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v.*

*Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

**F.     Analysis**

As set forth above, the ALJ found that Minke retains the RFC to perform sedentary work, with certain additional limitations. (Tr. 189). In her motion for summary judgment, Minke argues that the ALJ's RFC finding is not supported by substantial evidence because it fails to take into account her multiple hospitalizations, which impact her ability to perform work on a regular and continuous basis.[3] (Doc. #13 at 11-14). For the reasons set forth below, the Court agrees and, thus, finds that remand is warranted.

As the Sixth Circuit has recognized, "Residual functional capacity is defined as the most a claimant can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009) (citing 20 C.F.R. §§404.1545(a) and 416.945(a)). Pursuant to Social Security Ruling ("SSR") 96-8p:

> In assessing RFC, the adjudicator must discuss **the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)**, and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Soc. Sec. Rul. 96-8p*, 1996 WL 374184, at *6-7 (July 2, 1996) (emphasis added). Minke argues,

---

[3] In her response, the Commissioner asserts that this argument is waived because Minke did not raise it before the ALJ. (Doc. #15 at 16-17). The Court disagrees. Evidence of Minke's multiple hospitalizations is contained in the record and was discussed by the ALJ in his decision (Tr. 189-94), and Minke's attorney specifically questioned the VE as to the effect of missing time from work due to medical problems (Tr. 255). Thus, this issue was adequately preserved.

then, that the ALJ erred in failing to consider how her numerous hospitalizations impact her ability to perform sustained work activities on a regular and continuing basis within the meaning of SSR 96-8p. (Doc. #13 at 11).

While the ALJ does discuss some of Minke's hospitalizations (Tr. 190-94), he fails to mention many others. Thus, the Court will begin its analysis with a summary of all of Minke's numerous hospital visits during the relevant period of time.[4]

- On February 6, 2012, Minke presented to the emergency room with vomiting. (Tr. 997-1009). Her blood sugars were elevated, and she was administered IV medications. (*Id.*).

- On May 11, 2012, Minke was seen in the emergency room for a migraine headache. (Tr. 987-96). Again, she received IV medications. (*Id.*).

- On June 5, 2012, Minke presented to the emergency room with right ankle pain. (Tr. 976-86). After x-rays were negative, she was diagnosed with a sprained ankle and discharged. (*Id.*).

- On June 28, 2012, Minke returned to the emergency room with continued ankle pain. (Tr. 962-74). X-rays were again negative and she was discharged early the next morning. (*Id.*).

- Minke was hospitalized from August 8-10, 2012, for DKA. (Tr. 905-08). She reported nausea and vomiting, and her blood sugars were elevated. She was admitted and placed on an insulin drip until she could be stabilized. (*Id.*).

- Minke returned to the emergency room on August 29, 2012, with a migraine headache and difficulty breathing. (Tr. 1072-85). Again, her blood sugars were elevated, and she was administered IV medications. (*Id.*).

- From September 4-9, 2012, Minke was back in the hospital with "moderate to severe" DKA, along with intractable nausea and vomiting (a result of diabetic gastroparesis). (Tr. 909-22). She was placed on an insulin drip and eventually

---

[4] Prior to the application date (January 20, 2012), Minke had several other hospital visits: August 19-21, 2011 (for weakness, pain, hyperglycemia); August 30, 2011 (elevated blood sugars, pain); November 1-2, 2011 (elevated blood sugars); and November 8-9, 2011 (DKA, shortness of breath). (Tr. 468-79, 568-87, 588-616, 650-53, 671). At this last visit, the emergency room physician noted that Minke had a "do not resuscitate" order, questioning her as to "why she would make such a decision at such a young age." (Tr. 651). Minke responded by indicating that she was "sick of suffering from pain on a daily basis …." (*Id.*).

stabilized.

- On September 24, 2012, Minke returned to the emergency room with nausea and vomiting. (Tr. 1052-66). Again, her blood sugars were elevated (436), and she was administered IV medications. (*Id.*).

- Minke was again hospitalized with DKA from November 6-8, 2012. (Tr. 1086-1117). She was treated with IV insulin and discharged with diagnoses of DKA, dehydration, diabetes mellitus, fibromyalgia, chronic back pain, and scoliosis. (Tr. 1106).

- From November 18-20, 2012, Minke was again hospitalized, this time after she attempted suicide by stopping taking her insulin in the hope that "she would go into DKA and pass [away]." (Tr. 875). When she presented to the emergency room, her blood sugars were 703; she was started on IV insulin and eventually stabilized. (Tr. 875-85).

- Minke was admitted to the hospital from November 23-24, 2012, when she again stopped taking her insulin "because she wants to die unless they can figure out a way of managing her chronic pain due to degenerative disk disease and fibromyalgia." (Tr. 939-40). She was administered IV insulin and stabilized.

- On January 5, 2013, Minke presented to the emergency room with confusion and altered mental status. (Tr. 1013-30). A CT of her brain was negative, and it was determined that she had experienced "drug-induced hypoglycemia" as a result of a recent medication change. (Tr. 1013, 1028).

- On January 18, 2013, Minke returned to the emergency room with a knee injury (an apparent sprain). (Tr. 1152-60).

- A few days later, on January 22, 2013, Minke again presented to the emergency room with knee pain, which was characterized as a suspected occult fracture. (Tr. 1138-51).

- From February 5-6, 2013, Minke was again in the hospital with nausea, vomiting, and elevated blood sugar levels (over 600). (Tr. 1239-44). She was admitted, started on an insulin drip, and monitored until her blood sugar levels normalized. (Tr. 1240).

- Minke was seen in the emergency room on April 10, 2013, with elevated blood sugars. (Tr. 1334). Again, she was administered IV insulin, stabilized, and released. (*Id.*).

- Minke was hospitalized from April 17-22, 2013, this time after she refused to take her insulin (while in jail on a probation violation) in an attempt to commit suicide because she was reportedly in so much pain. (Tr. 1315).

10

- From May 30-31, 2013, Minke was again in the hospital, diagnosed with generalized weakness with the inability to ambulate and uncontrolled diabetes. (Tr. 1537-42). A CT of her brain was normal, and it was suspected that a recent change in her medications could have caused a movement disorder. (Tr. 1542).

- The next day, June 1, 2013, Minke returned to the hospital with continued weakness and shaking in the lower extremities and an inability to ambulate. (Tr. 1529-34). MRIs of her brain and spine were negative, but she remained in the hospital until June 4, 2013. (*Id.*).

- Minke was back in the emergency room on June 15, 2013, with weakness in her legs. (Tr. 1525-28). She was administered IV medication and discharged. (*Id.*).[5]

In summary, then, between the application date (January 20, 2012) and the last visit prior to the ALJ's decision (June 15, 2013) – an approximately sixteen month period of time – Minke spent all or part of 39 days in the hospital. On average, then, Minke was in the hospital for some or all of 2.4 days per month during this time. And, as Minke points out, the VE specifically testified at the hearing before the ALJ that if the hypothetical individual missed two or more days per month because of medical problems, she would be precluded from all competitive work. (Tr. 255).

Courts have recognized that an ALJ's failure to consider the effect of numerous hospitalizations on a claimant's ability to work constitutes reversible error. For example, in *O'Mahony v. Colvin*, 2015 WL 3505211, at *3 (M.D.N.C. June 3, 2015), a case cited by Minke, the plaintiff argued that the ALJ erred "by not considering and explaining the effect of [his] recent history of frequent hospitalizations on his ability to obtain and sustain employment." In that case, the plaintiff spent approximately 25 days hospitalized during a ten-month period, which the vocational expert testified "would not allow for competitive employment." *Id.* The

---

[5] After the ALJ's July 26, 2013 decision, Minke had numerous other hospital visits: November 18, 2013 (for nausea and vomiting related to gastroparesis); November 26-28, 2013 (nausea and vomiting); December 2-4, 2013 (nausea, vomiting, DKA); January 10-11, 2014 (weakness, confusion, disorientation); February 15, 2014 (leg swelling); March 2, 2014 (weakness); March 16, 2014 (bleeding from Medport); April 7, 2014 (vomiting); April 8, 2014 (vomiting); April 12, 2014 (leg swelling); April 27, 2014 (difficulty breathing); May 2-3, 2014 (suspected seizure); May 5-6, 2014 (nosebleed); May 9, 2014 (GI bleed); July 15-16, 2014 (DKA); July 29, 2014 (hyperglycemia). (Tr. 56, 63, 73, 80, 94, 110, 120, 123, 127, 135, 138, 145, 154, 169, 172, 176).

11

*O'Mahony* court found that the ALJ erred in failing to analyze the effect of the plaintiff's history of frequent hospitalizations on his ability to obtain employment and remanded the case for further consideration of that issue. *Id.* at *4.

Similarly, in *Hawke-Dingman v. Comm'r of Soc. Sec.*, 2012 WL 5328674 (E.D. Mich. Sept. 11, 2012), the court remanded the case pursuant to sentence six of 42 U.S.C. §402(g) when presented with evidence of several hospitalizations after the administrative hearing. In that case, the court recognized that the new evidence – when viewed in light of evidence previously presented – might establish that the plaintiff was unable to work on a regular and continuing basis. Specifically, the court observed:

> Between November 2009 and October 2010, Plaintiff was hospitalized for 44 days. She has now produced evidence that she was hospitalized for 14 days in 2011, and, so far in 2012, 11 days. It is far from plain that a person requiring hospitalization as frequently as Plaintiff – 69 days in less than three years (about two days per month) – would be able to maintain substantial gainful employment. In fact, the VE testified that missing more than two days of work per month would likely preclude full-time employment.

*Id.* at *12 (internal citations omitted). Other courts have reached similar conclusions when presented with similar facts. *See, e.g., Castaneda v. Colvin*, 2014 WL 1097864, at *6 (N.D. Ill. Mar. 17, 2014) (remanding where the ALJ failed to "build an adequate and logical bridge" between the evidence of multiple hospitalizations and the conclusion that the plaintiff retained the RFC to "consistently be at work"); *Jones v. Sec'y of Health & Human Servs.*, 758 F.2d 653 (6th Cir. 1985) (remanding where there was "no indication that the ALJ considered [the plaintiff's] repeated, lengthy hospitalizations in concluding that she was capable of performing sedentary work on a sustained basis"); *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987) (remanding to determine whether claimant's repeated hospitalizations would preclude work on a regular and continuing basis).

12

In the face of this case law, the Commissioner advances two arguments. First, she argues that, because the majority of Minke's hospitalizations were for physical impairments, "it was incumbent on [her] to comb through this excruciatingly long record and cite to evidence proving that her physical impairments stayed at a disabling level in between her hospitalizations – something that required far more than simply creating a table summarizing the dates and purported reasons for these hospitalizations." (Doc. #15 at 16 (citing *Maher v. Sec'y of Health & Human Servs.*, 898 F.2d 1106, 1109 (6th Cir. 1989)). But this argument misses the mark as many, if not the majority, of Minke's hospitalizations related to issues she was having with her diabetes, depression, and pain, all of which are impairments the ALJ found to be severe. (Tr. 187). In this regard, the Court finds *Maher* distinguishable. In that case, the issue was whether the plaintiff met the twelve-month durational requirement necessary to establish disability where he underwent six surgical procedures in five years, but his "period of convalescence was never more than several months for each procedure." *Maher*, 898 F.2d at 1108. In this case, however, the issue is not whether Minke met the durational requirement[6], but whether, considering the effects of all of her impairments – both "severe" and "non-severe" – the evidence establishes that she retains the RFC to perform sustained work activities on a regular and continuing basis. *See Soc. Sec. Rul. 96-8p*, 1996 WL 374184, at *6-7 (July 2, 1996). Here, where all of Minke's hospitalizations (save for those pertaining to her knee and ankle sprains) relate in some way to her severe impairments, the ALJ erred in failing to consider the effect of those frequent hospitalizations on her ability to perform work on a regular and continuing basis.

---

[6] Indeed, the ALJ specifically found at Step Two of the sequential analysis that Minke suffers from six "severe" impairments, including diabetes mellitus, fibromyalgia, and back pain, and proceeded to Step Three of the analysis. Thus, the ALJ must have concluded that these severe impairments lasted or could be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §416.920(a)(4)(ii).

13

The Commissioner also argues that Minke's repeated hospitalizations were not disabling because eleven of those hospitalizations "lasted less than a day" and because the hospitalizations "result[ed] in improvement," suggesting that her impairments "'can be controlled with proper treatment.'" (Doc. #15 at 17-18 (quoting *Bryce v. Comm'r of Soc. Sec.*, 2014 WL 1328277, at *3 (E.D. Mich. Mar. 28, 2014)). The Court finds *Bryce* distinguishable, however. In that case, the ALJ specifically considered the plaintiff's hospitalizations, finding that they were not for extended durations, that his condition improved through the course of each hospitalization, and that his treatment was effective when he was compliant with it. *See Bryce*, 2014 WL 1328277, at *3. In contrast, the ALJ here conducted no such analysis and, indeed, failed to discuss the impact of these hospitalizations on Minke's ability to perform sustained work activities. Moreover, when the Court conducts its own review of the relevant medical evidence, the fact that she was hospitalized repeatedly, and usually required IV insulin to stabilize her high blood sugars, suggests that her diabetes and chronic pain were far from "controlled."[7]

In summary, then, the evidence establishes that between January 2012 and June 2013, Minke spent all or part of 39 days in the hospital (an average of 2.4 days per month). Given these facts, and the VE's testimony discussed above, the Court cannot say that the ALJ's failure to discuss and analyze the impact of Minke's frequent hospitalizations on her ability to perform sustained work activities on a regular and continuing basis was harmless error. As such, remand

---

[7] The Commissioner also seeks to minimize the import of Minke's hospitalizations by arguing that some were the result of "questionable compliance with her insulin" or "refusing her diabetes medications." (Doc. #15 at 19, 21). This argument is not persuasive where the ALJ found Minke to suffer from the severe impairment of depression (Tr. 187), and the evidence indicates that when she failed to take her insulin, she did so in an effort to enter DKA and "die 'naturally'" so as to end her continued pain. (Tr. 872). Thus, it certainly appears at least possible that any alleged noncompliance with treatment was, at least in part, the result of Minke's severe mental impairment, a fact that the ALJ should have considered.

is warranted.[8]

## III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [15] be DENIED, Minke's Motion for Summary Judgment [13] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: July 18, 2016  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
 United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Minke v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829

---

[8] Minke also argues that the ALJ's credibility determination is not supported by substantial evidence. (Doc. #13 at 15-22). Because the Court is recommending remand on other grounds, it need not pass on this alleged error. However, on remand, the ALJ should re-evaluate Minke's credibility based on a review of the full record.

F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 18, 2016.

                                                s/Eddrey O. Butts
                                                EDDREY O. BUTTS
                                                Case Manager